Filed 9/20/23

# IN THE SUPREME COURT OF CALIFORNIA

PICO NEIGHBORHOOD ASSOCIATION et al.,
Plaintiffs and Respondents,

v.

CITY OF SANTA MONICA,
Defendant and Appellant.

S263972

Second Appellate District, Division Eight
B295935

Los Angeles County Superior Court
BC616804

---

## ORDER MODIFYING OPINION

THE COURT:

The opinion in this matter, filed on August 24, 2023, and appearing at 15 Cal.5th 292, is modified as follows:

The text of footnote 8 on page 317 of the opinion is deleted in its entirety and replaced with the following:
> Under ranked choice voting, a voter ranks candidates in order of preference. In an election to fill more than one seat, such as for a city council, each ballot is counted at the start of

1

tabulation as one vote for its first-choice ranked candidate. Any candidate with more votes than the election threshold (see fn. 11, *post*) is declared elected. If the first round of the vote counting does not fill all the seats, then the system consults the next-ranked choices from the ballots supporting the candidate with the least number of votes, the next-ranked choices from the surplus ballots (i.e., those in excess of what was needed for the elected candidate to win), or both. Jurisdictions use a variety of methods to determine when and how to transfer the next-ranked choices from surplus ballots. This form of tabulation continues until all seats are filled. (See Tideman, *The Single Transferable Vote* (Winter 1995) 9 J. Econ. Persp. 27, 27–28, 32–35; see generally Note, *The Madisonian Case for Ranked Choice Voting: Federalist No. 10, Preferential Voting, and the American Democratic Tradition* (2021) 23 N.Y.U. J. Legis. & Pub. Pol'y 953, 963.)

This modification does not affect the judgment.

Nonparty David A. Holtzman's request for modification of the opinion is denied.

2

# IN THE SUPREME COURT OF CALIFORNIA

PICO NEIGHBORHOOD ASSOCIATION et al.,
Plaintiffs and Respondents,

v.

CITY OF SANTA MONICA,
Defendant and Appellant.

S263972

Second Appellate District, Division Eight
B295935

Los Angeles County Superior Court
BC616804

---

August 24, 2023

Justice Evans authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Liu, Kruger,
Groban, and Jenkins concurred.

---

PICO NEIGHBORHOOD ASSOCIATION v.
CITY OF SANTA MONICA

S263972


Opinion of the Court by Evans, J.


Local governments make many of the most important decisions that affect Californians' everyday lives. They build and repair public streets, they define a neighborhood's character through planning and zoning, and they decide where to place public parks and where to allow restaurants, bars, and liquor stores to operate. They make decisions about public transit and decide where to site industries that cause pollution. They provide police services and determine the level and type of policing and other first responder services, they educate our children, they operate or regulate local utilities, and they have the power to levy taxes. The people exercise control over these choices by electing representatives to city councils, county boards, boards of education, community college boards, special district boards, and other bodies.

The genius of representative government, in all its guises, is that it is responsive to the people it serves. But its ability to be responsive is dependent in a fundamental way on the assumption that each person's vote is of equal weight. While we often take that assumption for granted, sometimes the actual value of one's vote can vary based on the way the voting is structured. For example, a minority of voters may find itself unable to elect even a single member of a multimember body when the members are elected at large, but would be able to

1

elect one or more representatives if the members were elected by districts or by another lawful method.

In such circumstances, the voting rules may effectively decide whether a group of voters can have a voice in the myriad decisions made by local representatives. With a seat at the table, the voters' representative can have a say in the topics and terms of the debate on the many crucial decisions that local governments make. Without a seat, though, the voters' voice may be effectively muted or silenced and their needs and preferences may be ignored or given less weight.

To address this problem, federal and state law restrict at-large voting systems from unfairly submerging or diluting the votes of a minority in the majority's greater numbers. Section 2 of the federal Voting Rights Act of 1965 (52 U.S.C. § 10301; VRA) prohibits states and their political subdivisions from using an at-large method of election when such a scheme would "result in unequal access to the electoral process" based on protected characteristics of race, color, or membership in a language minority group. (*Thornburg v. Gingles* (1986) 478 U.S. 30, 46 (*Gingles*).) In an effort to provide greater protections to California voters than those provided by the VRA, the Legislature subsequently enacted the California Voting Rights Act of 2001 (Elec. Code, § 14025 et seq.; CVRA). The CVRA prohibits an at-large method of election "that impairs the ability of a protected class" (*id.*, § 14027) — as defined by race, color, or language minority group (*id.*, § 14026, subd. (d)) — "to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the dilution or the abridgment of the rights of voters who are members of a protected class" (*id.*, § 14027).

Both statutory schemes require a plaintiff to show racially polarized voting — i.e., that the protected class members vote as a politically cohesive unit, while the majority votes "sufficiently as a bloc usually to defeat" the protected class's preferred candidate. (*Gingles*, *supra*, 478 U.S. at p. 56; accord, Elec. Code, §§ 14026, subd. (e) [providing that "racially polarized voting" may be established by "[t]he methodologies for estimating group voting behavior as approved in applicable federal cases to enforce the [VRA]"], 14028, subd. (a).) The CVRA, however, "make[s] it easier to successfully challenge at-large districts" in two significant respects. (Assem. Com. on Elections, Reapportionment and Const. Amends., Analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Mar. 18, 2002, p. 4.) First, the CVRA, unlike the VRA, does not require a plaintiff to demonstrate that the members of the protected class would be geographically compact or concentrated enough to constitute a majority of a hypothetical single-member district. (Compare Elec. Code, § 14028, subd. (c) with *Gingles*, at p. 50.) Second, while a plaintiff can succeed under either the VRA or the CVRA by showing that the at-large method dilutes a protected class's voting power by impairing its ability "to elect" candidates of its choice (52 U.S.C. § 10301(b); Elec. Code, § 14027), only the CVRA allows the plaintiff to prevail by demonstrating, in the alternative, that the at-large method impairs the class's ability "to *influence* the outcome of an election." (Elec. Code, § 14027, italics added; cf. *League of United Latin American Citizens v. Perry* (2006) 548 U.S. 399, 446 (*LULAC*) (plur. opn. of Kennedy, J.) ["The failure to create an influence district . . . does not run afoul of § 2 of the [VRA]"].)

In this case, the trial court determined that because of racially polarized voting, the at-large method of electing city

council members in the City of Santa Monica (the City) diluted Latino voters' ability to elect their preferred candidates and their ability to influence the outcome of council elections, as compared to several alternative electoral methods, including district elections. To remedy this violation, the trial court ordered the City to promptly conduct a special election using a seven-district map drafted by an expert who testified at trial.

The Court of Appeal granted a stay of the judgment and then reversed. It disagreed with the trial court's finding that the at-large method of election had "impaired Latinos' ability to elect candidates of their choice or to influence the outcome of an election." In the Court of Appeal's view, there had been no dilution of Latino voters' ability to elect their preferred candidates because Latino voters were too few and too geographically dispersed "to muster a majority, no matter how the City might slice itself into districts." The court likewise found no dilution of Latino voters' ability to influence the outcome of an election because a group's ability to influence an election, the Court of Appeal reasoned, has no meaning independent of the group's ability to elect its preferred candidate. In light of its findings, the Court of Appeal found it unnecessary to consider whether racially polarized voting had been established.

We conclude the Court of Appeal misconstrued the CVRA. To prevail on a CVRA claim, a plaintiff who has established the existence of racially polarized voting in an at-large system need not prove that the protected class would constitute a majority — or, as the City proposes, a near majority — of a hypothetical single-member district. City council elections, after all, are nonpartisan (Cal. Const., art. II, § 6), and the record here shows that winning candidates often earn only a plurality of the vote.

Accordingly, what is required to establish "dilution" of a protected class's "ability . . . to elect candidates of its choice" (Elec. Code, § 14027) is proof that, under some lawful alternative electoral system, the protected class would have the potential, on its own or with the help of crossover voters, to elect its preferred candidate. The lawful alternative electoral system may include, but is not limited to, single-member district elections.

A court presented with a dilution claim should undertake a searching evaluation of the totality of the facts and circumstances (see, e.g., Elec. Code, § 14028, subd. (e)), including the characteristics of the specific locality, its electoral history, and " 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms" as well as the design and impact of the potential alternative electoral system. (*Gingles*, *supra*, 478 U.S. at p. 79; see *Allen v. Milligan* (2023) ___ U.S. ___, ___ [216 L.Ed.2d 60, 75] (*Milligan*).) In predicting how many candidates are likely to run and what percentage may be necessary to win, courts may also consider the experiences of other similar jurisdictions that use alternative electoral systems. (Cf. *Gingles*, at p. 56.)

Because the Court of Appeal did not evaluate the dilution element of the CVRA under this standard, we reverse the judgment and remand the matter to the Court of Appeal for it to reconsider in the first instance the CVRA claim presented here.

## I. BACKGROUND

Defendant, the City of Santa Monica, has a seven-member city council. Members are elected at large through staggered elections: four are elected during the year of a presidential election, while the other three are elected during the year of a

5

gubernatorial election. Plaintiff Pico Neighborhood Association is a nonprofit organization dedicated to advancing the interests of the residents of the City's Pico neighborhood, where its Latino residents are concentrated. While Latinos constitute only 13.64 percent of the City's citizen-voting-age population, they make up 30 percent of Pico's citizen-voting-age population.

In April 2016, plaintiffs Pico Neighborhood Association and Maria Loya, a Latina registered voter, filed this action against the City, alleging that the City's at-large method of electing its city council unlawfully impaired the ability of Latino voters to elect their preferred candidates or, alternatively, to influence the outcome of council elections. The at-large scheme, in plaintiffs' view, violated the CVRA as well as the equal protection clause of the California Constitution (Cal. Const., art. I, § 7, subd. (a)).

Following a six-week trial, the Los Angeles County Superior Court ruled in plaintiffs' favor on both claims, but this appeal concerns only the CVRA claim. After reviewing elections over the preceding 24 years, the court declared that "a consistent pattern of racially-polarized voting emerges. In most elections where the choice is available, Latino voters strongly prefer a Latino candidate running for Defendant's city council, but, despite that support, the preferred Latino candidate loses." Indeed, at the time of the court's ruling, "only one Latino ha[d] been elected to the Santa Monica City Council in the 72 years of the current election system."[1] The court further observed that

---

[1] The City asserts that in the 2020 city council election, four and one-half years after plaintiffs filed this action, three of the five winning candidates were Latino. Plaintiffs dispute this

the statistical evidence of racially polarized voting was corroborated by multiple qualitative factors within the meaning of Elections Code section 14028, subdivision (e): a history of discrimination against Latinos in Los Angeles County generally and in the City specifically; the use of staggered elections, which may have discriminatory effects in some circumstances; an income disparity between the City's Latinos and its majority population that is "far greater than the national disparity"; the use of racist appeals in city council campaigns; and the lack of responsiveness to the interests and concerns of the City's Latino community, including the substantial underrepresentation of Latinos on the City's various commissions.

The trial court further found that the City's at-large voting system unlawfully diluted the electoral strength of its Latino residents within the meaning of the CVRA, in that several alternative voting systems — e.g., district-based elections, cumulative voting, limited voting, and ranked choice voting — would better enable Latino voters "to elect candidates of their choice or influence the outcomes of elections." In light of "the national, state and local experiences with district elections, particularly those involving districts in which the minority group is not a majority of eligible voters," the court adopted the election map drafted by plaintiffs' expert, which created seven council districts. The court ordered a special, district-based election for all seven seats to be held on July 2, 2019.

The City successfully petitioned for a writ of supersedeas to stay the trial court's order for new elections pending resolution of its appeal. In that appeal, the Second Appellate

characterization of the winning candidates' ethnicities. Given the limited issue before us, we express no view on the dispute.

District, Division Eight, reversed the trial court judgment, finding that the City's at-large voting system violated neither the CVRA nor the California Constitution.  The Court of Appeal began by rejecting plaintiffs' one-sentence argument that a CVRA violation could be established merely by evidence of racially polarized voting without any further showing that the City's at-large voting system "diluted" Latino voting power as compared to " 'some alternative method of election.' "  The court next concluded that changing from an at-large system (where Latinos constituted approximately 14 percent of the voting population) to a district system (where Latinos would constitute 30 percent of a district centered around the Pico neighborhood) would not enhance Latino voters' ability to elect their candidates of choice or influence the outcome of an election in a "legally significant" way and therefore failed to demonstrate that the City's at-large system "dilut[ed]" their voting power within the meaning of the CVRA.  Plaintiffs' theory, the Court of Appeal reasoned, "would create absurd results," in that "any unrealized increase in a group's percentage would satisfy the dilution element," even if the group had "a vanishingly small numerical presence."  The court likewise rejected plaintiffs' contention that other voters might " 'cross over' and vote for Latino candidates, buoying Latino power and clearing the 50 percent threshold to electoral success."  Such a suggestion, the Court of Appeal claimed, "arbitrarily embraces racially polarized voting when it helps and abandons it when it hurts."  In light of its conclusion that plaintiffs had failed to demonstrate dilution, the court did not consider whether plaintiffs had demonstrated the existence of racially polarized voting.

We granted plaintiffs' petition for review to determine what constitutes dilution of a protected class's ability to elect

candidates of its choice or to influence the outcome of an election within the meaning of the CVRA. We also ordered depublication of the Court of Appeal opinion. (*Pico Neighborhood Assn. v. City of Santa Monica*, S263972, Supreme Ct. Mins., Oct. 21, 2020.)

## II. DISCUSSION

Different electoral systems can lead to different outcomes. (See Engstrom, *Modified Multi-Seat Election Systems As Remedies for Minority Vote Dilution* (1992) 21 Stetson L.Rev. 743, 743 (Engstrom).) For example, where a racial minority and a racial majority consistently prefer different candidates, "multimember districts and at-large voting schemes may ' "operate to minimize or cancel out the voting strength of racial [minorities in] the voting population." ' " (*Gingles*, *supra*, 478 U.S. at p. 47.) The use of at-large voting schemes in such circumstances allows the majority, by virtue of its numerical superiority, not only to regularly defeat the candidates preferred by the minority (*id.* at p. 48), but also to " 'ignore [minority] interests without fear of political consequences,' [citation] leaving the minority effectively unrepresented." (*Id.* at p. 48, fn. 14.) If, on the other hand, the political unit were "divided into single-member districts," those same minority groups "may be able to elect several representatives." (*Rogers v. Lodge* (1982) 458 U.S. 613, 616.) This potential disparity is why the high court has "stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts." (*Growe v. Emison* (1993) 507 U.S. 25, 40.)

The VRA and the CVRA each offer an opportunity for racial and language minority groups to challenge the dilution of

their voting power caused by at-large voting systems. But they do so in somewhat different ways. Because the CVRA bears some similarities to the VRA, while also seeking to address perceived inadequacies in the VRA, we begin with a review of both statutory schemes.

## A. The VRA and the CVRA, Compared

### 1. *The VRA*

The VRA, as amended in 1982, prohibits a state or its political subdivisions from using any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group]" where, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [the protected] class of citizens . . . in that its members have less opportunity than other members of the electorate . . . to elect representatives of their choice." (52 U.S.C. § 10301(a), (b).) An at-large electoral system or multimember district[2] can qualify as a prohibited practice under the VRA when the plaintiff can show that a bloc-voting majority is

---

[2] "In an at-large (or multi-member district) system, all voters elect all representatives, and each voter has as many ballots as there are positions available. This system contrasts with a single-member district plan, under which the entire political jurisdiction is divided into districts roughly equal in population, each of which selects one representative by vote within the district." (*Badillo v. Stockton* (9th Cir. 1992) 956 F.2d 884, 889.)

"*usually* . . . able to defeat candidates supported by a politically cohesive, geographically insular minority group." (*Gingles*, *supra*, 478 U.S. at p. 49.) " '[T]he greater the degree to which the electoral minority is homogenous and insular and the greater the degree that bloc voting occurs along majority-minority lines, the greater will be the extent to which the minority's voting power is diluted by multimember districting.' " (*Id*. at p. 50.)

A plaintiff asserting a "vote dilution" challenge to an at-large voting system under the VRA must satisfy "three threshold conditions." (*Voinovich v. Quilter* (1993) 507 U.S. 146, 157.) "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed, [citation] — usually to defeat the minority's preferred candidate." (*Gingles*, *supra*, 478 U.S. at pp. 50–51, fn. omitted.) Once those predicate facts have been established, "the trial court is to consider the 'totality of the circumstances' and to determine, based 'upon a searching practical evaluation of the "past and present reality," ' [citation], whether the political process is equally open to minority voters. ' "This determination is peculiarly dependent upon the facts of each case," ' [citation], and requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." (*Id*. at p. 79.) In undertaking this analysis, the court considers a number of factors that "typically may be relevant" to a claim under the VRA (*Gingles*, at p. 44) and that

are sometimes called " 'the Senate factors' "[3] because they appeared in the 1982 Senate Judiciary Committee majority report that accompanied the bill amending the VRA (*Yumori-Kaku v. City of Santa Clara* (2020) 59 Cal.App.5th 385, 394).

### 2. *The CVRA*

While the CVRA is "much like" the VRA in some ways, there are notable differences between the two statutory schemes. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Apr. 9, 2002, p. 2.) Four stand out in this proceeding. First, unlike the VRA, the CVRA applies only to "[a]n at-large method of election" (Elec. Code, § 14027) for nonpartisan offices (*id.*, § 14026, subds. (a), (c); see Cal. Const., art. II, § 6). Second, the CVRA addresses not only impairments to a protected class's "ability . . . to elect candidates of its choice" (Elec. Code, § 14027; cf. 52 U.S.C. § 10301(b) ["opportunity . . . to elect representatives of their choice"]), but

---

[3]  The Senate factors include "the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction." (*Gingles, supra*, 478 U.S. at pp. 44–45.)

also the class's "ability to *influence* the outcome of an election" (Elec. Code, § 14027, italics added).  Third, the CVRA made it easier to challenge at-large electoral systems by explicitly rejecting the first *Gingles* precondition: "The fact that members of a protected class are not geographically compact or concentrated may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section, but may be a factor in determining an appropriate remedy." (Elec. Code, § 14028, subd. (c).)  Fourth, the CVRA includes its own list of potentially probative factors, many of which overlap with the Senate factors above, but cautions that they are "not necessary factors to establish a violation" of the CVRA.  (Elec. Code, § 14028, subd. (e).)[4]

Despite these differences, the CVRA, like the VRA, requires a plaintiff claiming vote dilution arising from an at-large voting system to establish the existence of racially polarized voting — i.e., that the protected class members vote as a politically cohesive unit, while the majority votes "sufficiently as a bloc usually to defeat" the protected class's preferred candidate. (*Gingles*, *supra*, 478 U.S. at p. 56; accord, Elec. Code, §§ 14026, subd. (e) [providing that "racially polarized voting"

---

[4]    The CVRA factors include "the history of discrimination, the use of electoral devices or other voting practices or procedures that may enhance the dilutive effects of at-large elections, denial of access to those processes determining which groups of candidates will receive financial or other support in a given election, the extent to which members of a protected class bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process, and the use of overt or subtle racial appeals in political campaigns."  (Elec. Code, § 14028, subd. (e).)

may be established by "[t]he methodologies for estimating group voting behavior as approved in applicable federal cases to enforce the [VRA]"], 14028, subd. (a).)[5]

## B. Defining Terms in the CVRA

The CVRA prohibits the use of an at-large method of election when it "impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the dilution or the abridgment of the rights of voters who are members of a protected class." (Elec. Code, § 14027.) Plaintiffs contend that the City's at-large city council elections prevent Latino voters from electing, either on their own or with the support of crossover voters, their preferred candidate. They argue this diluted their ability to elect their candidate of choice as well as their ability to influence the outcome of an election. The statute, however, does not define "dilution," "ability . . . to elect candidates of its choice," or "ability . . . to influence the outcome of an election." (*Ibid*.) The meaning of these undefined terms presents a pure question of law that we review de novo. (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 857.)

### 1. *"Dilution"*

In plaintiffs' view, proof of racially polarized voting, in itself, establishes "dilution" within the meaning of the CVRA.

---

[5]    We do not consider here whether the City's elections are racially polarized — an issue the Court of Appeal has not yet addressed — but we do note that, under the CVRA, "[e]lections conducted prior to the filing of an action . . . are more probative to establish the existence of racially polarized voting than elections conducted after the filing of the action." (Elec. Code, § 14028, subd. (a).)

They rely on the "plain language" of Elections Code section 14028, subdivision (a), which provides, "A violation of Section 14027 *is established* if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision . . . ." (Italics added.) According to plaintiffs, "Section 14028 expressly states how a violation of Section 14027 is shown" — i.e., simply by demonstrating the existence of racially polarized voting in an at-large jurisdiction.

When considered in isolation, this single sentence might arguably be susceptible to plaintiffs' reading. However, a court construing a statute does not view a fragment in isolation, but considers the statute as a whole, in context with related provisions and the overall statutory structure, so that it may best identify and effectuate the scheme's underlying purpose. (See *People v. Pennington* (2017) 3 Cal.5th 786, 795.) As plaintiffs concede, and as the legislative history reveals, the CVRA is in many ways "very similar" to the VRA. (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 976 (2001–2002 Reg. Sess.) July 1, 2002, p. 4.) When we construe "dilution" under the CVRA, we must therefore be mindful that it is a term of art with a settled meaning under section 2 of the VRA: " 'The phrase vote dilution itself suggests a norm with respect to which the fact of dilution may be ascertained.' " (*Holder v. Hall* (1994) 512 U.S. 874, 880 (plur. opn. of Kennedy, J.).) To establish vote dilution under the VRA, "a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice." (*Holder*, at p. 880 (plur. opn. of Kennedy, J.); *id.* at p. 887 (conc. opn. of O'Connor, J.) ["On this, there is general agreement"]; *id.* at p. 951 (dis. opn. of Blackmun, J.) ["There is widespread agreement"].) So while the existence of racially

polarized voting " 'is relevant to a vote dilution claim' " under the VRA (*Gingles*, *supra*, 478 U.S. at p. 55) — and is indeed "a key element" (*ibid*.) — it is not in itself sufficient.

We find, for several reasons, the same is true under the CVRA. The similarities between the two schemes strongly suggest that "dilution" requires not only a showing that racially polarized voting exists, but also that the protected class thereby has less ability to elect its preferred candidate or influence the election's outcome than it would have if the at-large system had not been adopted. (Cf. *Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 874 [concluding that the Legislature intended to adopt the " 'widely understood' " meaning of a term in federal law]; *Davis v. City of Berkeley* (1988) 47 Cal.3d 512, 533 [concluding that undefined "terms of art" in a statute refer to the definitions provided by federal law].) Although the legislative history materials can be read in different ways, one committee analysis recognized that the CVRA targets racially polarized voting in at-large elections only "if it Impairs the Right of Protected Groups" to elect their preferred candidates or influence the outcome of an election. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976, *supra*, as amended Apr. 9, 2002, p. 2.) After all, "the very concept of vote dilution implies — and, indeed, necessitates — the existence of an 'undiluted' practice against which the fact of dilution may be measured." (*Reno v. Bossier Parish School Bd.* (1997) 520 U.S. 471, 480.)

Plaintiffs' construction would allow a party to prevail based solely on proof of racially polarized voting that could not be remedied or ameliorated by any other electoral system. Moreover, such a construction would render the word "dilution" in Elections Code section 14027 surplusage. Accordingly, we agree with the Court of Appeal that dilution is a separate

element under the CVRA.  To establish the dilution element, a plaintiff in a CVRA action must identify "a reasonable alternative voting practice" to the existing at-large electoral system that will "serve as the benchmark 'undiluted' voting practice." (*Reno v. Bossier Parish School Bd.*, *supra*, 520 U.S. at p. 480.)

### 2.  *"The Ability . . . to Elect Candidates of Its Choice"*

The CVRA does not explicitly define what it means to "impair[] the ability of a protected class to elect candidates of its choice."  (Elec. Code, § 14027.)  On this question, we find the VRA illuminating, but not dispositive.

An at-large electoral system impairs a protected class's ability "to elect representatives of their choice" under the federal act (52 U.S.C. § 10301(b)) only when the class can "demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." (*Gingles*, *supra*, 478 U.S. at p. 50.)  The rationale for the VRA approach is that "if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure." (*Gingles,* at p. 50, fn. 17.)

For some period after *Gingles*, it was uncertain whether the first *Gingles* requirement (i.e., whether the minority group is sufficiently large and compact) could be satisfied by proof that the minority population "is large enough to elect the candidate of its choice with help from voters who are members of the

majority and who cross over to support the minority's preferred candidate." (*Bartlett v. Strickland* (2009) 556 U.S. 1, 13 (plur. opn. of Kennedy, J.) (*Strickland*).) *Strickland* settled the question. It held that the VRA does not impose "a duty to give minority voters the most potential, or the best potential, to elect a candidate by attracting crossover voters." (*Strickland*, at p. 15 (plur. opn. of Kennedy, J.).) Dispensing with the requirement that the minority group, by itself, be sufficiently large and compact to constitute a majority in the hypothetical district, the court reasoned, "would call in question the *Gingles* framework." (*Strickland*, at p. 16 (plur. opn. of Kennedy, J.).)

The Court of Appeal effectively embraced the *Strickland* approach in construing the CVRA. It required a showing that Latino voters could constitute a majority, all by themselves, in a hypothetical single-member district. Indeed, it noted that "30 percent is not enough to win a majority" and rejected plaintiffs' contention that an ability to elect a preferred candidate could be shown in this case if non-Latino voters were to " 'cross over' and vote for Latino candidates, buoying Latino power and clearing the 50 percent threshold to electoral success."

The Court of Appeal erred in importing the VRA's majority-minority requirement into the CVRA. In enacting the CVRA, the Legislature wanted to make it "easier" for protected classes to demonstrate an ability to elect their preferred candidates under an alternative voting system. (Assem. Com. on Elections, Reapportionment and Const. Amends., Analysis of Sen. Bill No. 976, *supra*, as amended Mar. 18, 2002, p. 4.) No longer would plaintiffs need to show the protected class was sufficiently large and geographically compact to muster a majority in a hypothetical district: "The fact that members of a protected class are not geographically compact or concentrated

may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section . . . ." (Elec. Code, § 14028, subd. (c); see Sen. Com. on Elections and Reapportionment, Analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended May 1, 2001, p. 3 ["Unlike the preconditions established by the Supreme Court in Thornburg v. Gingles, this bill does not require that the minority community be geographically compact or concentrated"]; Assem. Com. on Elections, Reapportionment and Const. Amends., Analysis of Sen. Bill No. 976, *supra*, as amended Mar. 18, 2002, p. 4 ["This bill requires that only two of those [*Gingles*] conditions be met"].)

The Legislature's rationale for rejecting the majority-minority requirement seems clear enough:  It would make little sense to require CVRA plaintiffs to show that the protected class could constitute a majority of a hypothetical district, given that the CVRA is not limited to ability-to-elect claims nor are its remedies limited to district elections.  (See, e.g., *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 670 ["In a cumulative voting system, a politically cohesive but geographically dispersed minority group can elect a single candidate . . . although it would be unable to elect any candidates in a conventional winner-take-all at-large system and could not form a majority in any feasible district in a district system"].)  Though the parties have focused in this court on district elections, the trial court found that, in addition to district elections, several alternative at-large election methods — cumulative voting, [6]

---

[6]     Under cumulative voting, "a voter receives as many votes as there are candidates to elect, but may cast multiple votes for a single candidate." (*Portugal v. Franklin County* (Wn. 2023) 530 P.3d 994, 1002 (*Portugal*).)

limited voting, [7] and ranked choice voting [8] — would each enhance Latino voting power and their ability to elect candidates of their choice. None of these methods would require a winning candidate to muster a majority in a hypothetical district. We can think of no reason why a CVRA claim based on any of these alternate at-large election methods should depend on such a showing. (Cf. Elec. Code, § 14028, subd. (c) ["that members of a protected class are not geographically compact or concentrated . . . may be a factor in determining an appropriate remedy"].) Furthermore, the Legislature clearly intended to make the CVRA more expansive than the VRA — by, for example, explicitly recognizing claims based on dilution of the "ability to influence the outcome of an election." (Elec. Code, § 14027.)

Even in the context of district elections, the Court of Appeal's focus on a majority-minority district was misguided. The Court of Appeal feared that allowing a plaintiff to rely on crossover votes "arbitrarily embraces racially polarized voting when it helps and abandons it when it hurts," which it viewed as creating "a manipulable standard boiling down to plaintiff

---

[7] Under limited voting, "a voter receives fewer votes than there are candidates to elect." (*Portugal, supra,* 530 P.3d at p. 1002.)

[8] Under ranked choice voting, a voter ranks candidates in order of preference. If no candidate has a majority of first-place votes, then the candidate with the least number of votes is eliminated and that candidate's ballots are reviewed for the voter's second choice. The process continues until only two candidates remain, and the candidate with the greater number of votes is declared the winner. (*Portugal, supra,* 530 P.3d at p. 1002; see *Kohlhaas v. State* (Alaska 2022) 518 P.3d 1095, 1102.)

always wins." But far from embracing racially polarized voting "when it helps" and abandoning it "when it hurts," plaintiffs are merely pointing out the differing effects of racially polarized voting in two different settings. To challenge an at-large electoral system, a plaintiff must first demonstrate the existence of racially polarized voting — i.e., cognizable differences "in the choice of candidates or other electoral choices that are preferred by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate." (Elec. Code, § 14026, subd. (e).) The plaintiff must next show that the protected class would have the potential to elect its preferred candidate or candidates under a different electoral system (say, district elections). In calculating the protected class's voting strength under the alternative system, the plaintiff does not "abandon[]" racially polarized voting. Rather, the plaintiff must prove that, assuming the *same* degree of racial polarization, the greater concentration of protected class voters in the hypothetical district would nonetheless be sufficient to enable them to elect their preferred candidate when combined with the available crossover votes. Alternatively, the plaintiff may be able to demonstrate sufficient voting strength where racially polarized voting by other voters *in the hypothetical district* is lower than in the community as a whole. In neither instance is the plaintiff seeking to "abandon" racially polarized voting "when it hurts."[9]

_____

[9] We recognize that where there is *complete* racial polarization, the protected class may itself need to make up a majority of the district in order to have an ability to elect its preferred candidate. But " '[*i*]*n practice, such extreme conditions are never present.*' " (*Strickland, supra,* 556 U.S. at p. 45 (dis.

The City's position in this court is slightly more nuanced, but no more persuasive. The City allows that there may be "room to expand vote-dilution claims beyond section 2's narrow ambit," but only "where the relevant minority group would account for a near-majority of voters in a hypothetical district with a history of reliable crossover support from other voters." The City does not dispute, however, that defining a near majority presents a new set of line-drawing problems. And in any case the CVRA permits consideration of at-large remedies such as cumulative voting, limited voting, or ranked choice voting — none of which would depend on the existence of a near majority in some hypothetical district that would never be drawn or used.

These omissions counsel against adoption of the City's position. Rather than quibble over whether a protected class falls on one side or the other of an undefined near-majority line, we think it more sensible to inquire directly whether the prospect of crossover support from other voters under a lawful alternative electoral scheme would offer the protected class,

_____

opn. of Breyer, J.) ["No voting group is 100% cohesive"]; see *id.* at pp. 32–33 (dis. opn. of Souter, J.) ["of course minority voters constituting less than 50% of the voting population can have an opportunity to elect the candidates of their choice, as amply shown by empirical studies confirming that such minority groups regularly elect their preferred candidates with the help of modest crossover by members of the majority"].) As the high court has acknowledged, "there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." (*Johnson v. De Grandy* (1994) 512 U.S. 997, 1020 (*De Grandy*).)

whatever its size, the potential to elect its preferred candidate. When the hypothetical alternative is district elections, a high degree of racially polarized voting may, in many cases, effectively require the protected class to constitute a substantial or very substantial minority of voters. The higher the degree of racial polarization, the greater the percentage required by the protected class to demonstrate it would be able, in combination with crossover voters, to elect its preferred candidate. But there is no reason to layer this inquiry with an additional predicate showing of some undefined near majority. All that is required is that the protected class be "sufficiently large . . . to elect candidates of its choice," even if it falls short of "an absolute majority of the relevant population." (*De Grandy*, *supra*, 512 U.S. at pp. 1008, 1009.)[10]

We are also sensitive to the fact that *Gingles*'s majority-minority requirement is a poor fit for the CVRA, which applies exclusively to nonpartisan elections. (See Cal. Const., art. II, § 6.) In the City, for example, multiple candidates may vie for office, and a plurality can be sufficient to win. Requiring a protected class to demonstrate it could constitute a majority or near-majority of a hypothetical district would impose a

---

[10] An amicus curiae letter submitted in support of Pico Neighborhood Association's petition for review by the chairs of the Assembly's Latino, Black, and Asian and Pacific Islander caucuses recites that while some members were elected in majority-minority districts, many others were elected in districts in which their membership group made up only 20 to 40 percent of the eligible voters. The trial court here similarly found that candidates from minority groups who had been "unsuccessful in at-large elections have won district elections" in districts "where the minority group is one-third or less of a district's electorate."

threshold far higher than what the protected class's preferred candidate would actually need to be elected.  (See *Romero v. City of Pomona* (9th Cir. 1989) 883 F.2d 1418, 1424, fn. 7 ["Less than a majority, of course, might suffice in a district where candidates are elected by plurality"], overruled on other grounds in *Townsend v. Holman Consulting Corp.* (9th Cir. 1990) 929 F.2d 1358, 1363.)  We therefore decline to require a protected class demonstrate it would constitute a majority or near majority of a hypothetical district in all circumstances.

### 3. *"Dilution" of "the Ability . . . to Elect Candidates of Its Choice"*

Accordingly, to establish dilution of a protected class's ability to elect its preferred candidate under the CVRA, a plaintiff must demonstrate "the *potential* to elect representatives" under some lawful alternative electoral method.  (*Gingles*, *supra*, 478 U.S. at p. 50, fn. 17.)  One way to demonstrate the class's potential to elect its preferred candidates would be to show, as the VRA requires, that the class would be "sufficiently large and geographically compact to constitute a majority in a single-member district."  (*Gingles*, at p. 50.)  But that is not the only way.  (See Elec. Code, § 14028, subd. (c).)  Because the CVRA applies exclusively to nonpartisan elections, where there may be more than two candidates, the winner may prevail with far less than a majority of the vote.  Moreover, the protected class may be able to demonstrate its ability to attract crossover votes for its preferred candidate.  Finally, a plaintiff may identify nondistrict remedies that would enable the class, on its own or with the assistance of crossover votes, to elect its preferred candidate.  The minority population percentage necessary to win an election under some alternative at-large electoral systems — cumulative or ranked-choice

voting, for example — may be less than 25 percent. (See *Dillard v. Chilton County Bd. of Education* (M.D.Ala. 1988) 699 F.Supp. 870, 874 (*Dillard*) ["in a jurisdiction with seven seats, the threshold of exclusion[11] would be 12.5% plus" in a cumulative voting system]; Mulroy, *The Way Out: A Legal Standard for Imposing Alternative Electoral Systems as Voting Rights Remedies* (1998) 33 Harv. C.R.-C.L. L.Rev. 333, 342 [threshold for ranked-choice voting "is identical to that of cumulative voting"].)

Determining whether the protected class has the potential to elect its preferred candidate under some alternative system requires a " 'functional' analysis of the political process" in that locality and a " 'searching practical evaluation of the "past and present reality." ' " (*Gingles, supra,* 478 U.S. at pp. 62–63.) Courts should consider the totality of the facts and circumstances of the particular case (see, e.g., Elec. Code, § 14028, subd. (e)), including the characteristics of the specific locality, its electoral history, and " 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms" as well as the design and impact of the potential alternative system. (*Gingles*, at p. 79; see *Milligan, supra,* ___ U.S. at p. ___ [216 L.Ed.2d at p. 75].) This fact-specific inquiry accords with the legislative understanding that California is a large and diverse state that needs a flexible approach to address our changing demographics. (See Assem. Com. on Judiciary,

---

[11] "The threshold of exclusion 'is the percentage of the vote that will guarantee the winning of a seat even under the most unfavorable circumstances.' " (*Dillard, supra,* 699 F.Supp. at p. 874.) It "is calculated according to the following formula: $1/(1 + \text{number of seats available})$." (*U.S. v. Vill. of Port Chester* (S.D.N.Y. 2010) 704 F.Supp.2d 411, 450.)

Analysis of Sen. Bill No. 976, *supra*, as amended Apr. 9, 2002, p. 2 ["In California, we face a unique situation where we are all minorities"].)

The key inquiry in establishing dilution of a protected class's ability to elect its preferred candidate under the CVRA, therefore, is what percentage of the vote would be required to win — an inquiry that is not short-circuited merely because the protected class may fall short of an absolute majority (or something close to that). In predicting how many candidates are likely to run and what percentage may be necessary to win, courts may also consider the experiences of other similar jurisdictions that use district elections or other alternatives to traditional at-large elections. Courts should likewise keep in mind that the inquiry at the liability stage "is simply 'to prove that a solution is possible, and not necessarily to present the final solution to the problem.' " (*Pope v. County of Albany* (2d Cir. 2012) 687 F.3d 565, 576; see *Gingles*, *supra*, 478 U.S. at p. 50, fn. 17.)

At the remedial stage the focus will shift to which electoral system is "appropriate" and "tailored to remedy the violation." (Elec. Code, § 14029.) If the court selects a district remedy, then there must also be at least two public hearings before the maps are drafted and at least two more hearings once the maps have been drawn and published. (*Id.*, § 10010, subds. (a)(1), (2), (c).) In other words, the remedy the court ends up selecting under section 14029 may, but need not, be the benchmark the plaintiff offered to show the element of dilution.

The Court of Appeal feared that failing to craft a majority-minority requirement "would give a winning cause of action to any group, no matter how small, that can draw a district map

that would improve its voting power by any amount, no matter how miniscule." To prove its point, the court offered a hypothetical in which a protected class's share of the electorate could increase from 0.1 percent under an at-large system to 1.5 percent in a proposed district. Even though the group's voting power would increase 15-fold, it could have "no practical numerical influence in any voting system" because there would be "simply too few voters . . . to be numerically effective in an environment of race-based voting." This would, the Court of Appeal warned, "merely ensure plaintiffs always win."

We agree with the Court of Appeal that a plaintiff cannot prove dilution of its ability to elect its preferred candidate under the CVRA by showing that its voting share would increase 15-fold, from 0.1 percent to 1.5 percent, in a hypothetical district. In that circumstance, as the Court of Appeal explained, "[t]here are simply too few voters . . . to be numerically effective in an environment of race-based voting." But it does not follow that a majority (or near-majority) requirement should be judicially engrafted onto the CVRA. After all, by eliminating *Gingles*'s geographic compactness requirement, the Legislature rejected any requirement that the protected class constitute a majority of a hypothetical district. (See Elec. Code, § 14028, subd. (c).) What enables courts to sort successful claims from unsuccessful claims is the dilution element itself, which requires the plaintiff to show that the protected class would, under some lawful alternative, have a "real electoral opportunity" to elect its candidate of choice, either on its own or with the aid of crossover

voters. (*LULAC, supra*, 548 U.S. at p. 428; see *Pope v. County of Albany, supra*, 687 F.3d at p. 575, fn. 8.)[12]

The dilution element also ensures the protected class is not made worse off. To replace at-large with district elections under a dilution theory, a successful plaintiff must show not merely that the protected class would have a real electoral opportunity in one or more hypothetical districts, but also that the incremental gain in the class's ability to elect its candidate of choice in such districts would not be offset by a loss of the class's potential to elect its candidates of choice elsewhere in the locality. (Cf. *Georgia v. Ashcroft* (2003) 539 U.S. 461, 479 ["in examining whether the new plan is retrogressive, the inquiry must encompass the entire statewide plan as a whole"].) While "[t]he fact that the proposed remedy does not benefit *all* of the [protected class] in the City does not justify denying any remedy at all" (*Gomez v. Watsonville* (9th Cir. 1988) 863 F.2d 1407, 1414, italics added), it remains the plaintiff's burden to demonstrate that some lawful alternative method of election would improve the protected class's overall ability to elect its preferred candidates. As both sides in this proceeding agree, unless the plaintiff can demonstrate a net gain in the protected class's potential to elect candidates under an alternative system, it has not shown the at-large method of election "impairs" the ability of the protected class to elect its preferred candidates. (Elec. Code, § 14027; cf. *Beer v. United States* (1976) 425 U.S. 130, 141 ["the purpose of § 5 [of the VRA] has always been to

---

[12] Plaintiffs suggest it would be rare for a group constituting less than 25 percent of the relevant voting population to make the required showing. We have no occasion here to explore that suggestion, since the Latino population in the proposed district exceeds that threshold.

insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise"].)

We also reject the City's contention that a majority-minority requirement — or something close to it in the form of a near-majority requirement — is necessary to avoid difficult constitutional questions under the equal protection clause. In the City's view, it would be perilous for courts to draw race-based districts in the absence of a compelling justification. (See *Cooper v. Harris* (2017) 581 U.S. 285, 291–293.) Merely increasing the percentage of minority voters in a hypothetical district where "the increase will have no real-world effect," the City warns, is not a compelling justification. But the CVRA does not require a court to grant relief that has no real world effect. As stated above, the alternative voting system must offer the protected class at least a "*potential*" to elect its preferred candidates that did not exist under the at-large system. (*Gingles*, *supra*, 478 U.S. at p. 50, fn. 17.) Moreover, nothing in the CVRA requires a municipality or a court to select a district-based remedy or, even if it chooses to do so, to draw district lines, as the City contends, based "principally on race." To the contrary: California law directs that district boundaries comply with the state and federal Constitutions (as well as the VRA) (Elec. Code, § 21621, subd. (b)) and requires, to the extent practicable, that boundaries be "geographically contiguous" and maintain the integrity of "any local neighborhood or local community of interest." (*Id*., subd. (c)(1), (2).) State law also encourages district lines to be drawn along "natural and artificial barriers" and with "geographical compactness." (*Id*., subd. (c)(3), (4).) The City does not explain how or why districts

drawn in accordance with the above criteria would run afoul of the Constitution. (See *Miller v. Johnson* (1995) 515 U.S. 900, 916 ["legislatures will . . . almost always be aware of racial demographics"]; cf. *ibid.* [strict scrutiny applies only where "race was the predominant factor motivating the legislature's decision" and "the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations"].) Indeed, assuming lines are drawn "based on proper factors," whether to create a district where a protected class has the potential to elect its candidate of choice is "a matter of legislative choice or discretion." (*Strickland, supra,* 556 U.S. at p. 23 (plur. opn. of Kennedy, J.); see *Higginson v. Becerra* (9th Cir. 2019) 786 Fed.Appx. 705, 707–708.) That's precisely the choice the Legislature made in enacting the CVRA: "An at-large method of election may not be imposed or applied in a manner that impairs the ability of a protected class to elect candidates of its choice . . . ." (Elec. Code, § 14027.)

### 4. *"Dilution" of "the Ability . . . to Influence the Outcome of an Election"*

Unlike its federal analogue, the CVRA prohibits the use of an at-large electoral system that dilutes not only the ability of a protected class "to elect candidates of its choice," but also "its ability to influence the outcome of an election." (Elec. Code, § 14027.) The inclusion of the latter phrase further supports our conclusion that the CVRA cannot be read in the limited manner the City would like; indeed, the influence prong suggests a focus broader than the class's ability to elect its preferred candidates (with or without the help of crossover voters). (Cf. *Strickland, supra,* 556 U.S. at p. 13 (plur. opn. of Kennedy, J.) ["a minority

group can influence the outcome of an election even if its preferred candidate cannot be elected"]; *LULAC, supra,* 548 U.S. at pp. 445–446 (plur. opn. of Kennedy, J.) [distinguishing between a group's "ability to influence the outcome [of an election] between some candidates, none of whom is their candidate of choice," and the ability to elect "their candidate of choice"]; 10 Ill. Comp. Stat. 120/5-5(b) ["The phrase 'influence district' means a district where a racial minority or language minority can influence the outcome of an election even if its preferred candidate cannot be elected"].) As the Attorney General (who is appearing in this action as amicus curiae) suggests, a protected class's ability to influence the outcome of an election could include, for example, "forming a coalition with another group to elect a candidate acceptable to each" or "blocking an unacceptable candidate."

We need not decide the scope of the CVRA's ability-to-influence prong in this case, however. Plaintiffs did not argue in the trial court or in this court an influence theory distinct from their claim that the City's at-large election system diluted their ability to elect their candidates of choice.

### III. CONCLUSION

A group's ability "to compete successfully at electoral politics, in short, is often dependent on how the competition is structured." (Engstrom, *supra,* 21 Stetson L.Rev. at p. 743.) The CVRA represents the Legislature's effort to make that competition more fair. It bars the use of an at-large method of election if that method dilutes a protected class's ability to elect candidates of its choice or its ability to influence the outcome of an election. Dilution occurs when an at-large system denies a protected class the potential to elect its preferred candidate or

31

influence the election's outcome. The plaintiff in a CVRA action must identify a lawful alternative to the existing at-large electoral system that will serve as the benchmark undiluted voting system.

A protected class has the ability to elect its preferred candidate if it would have the potential to elect that candidate, on its own or with the assistance of crossover support from other voters, under an alternative voting system; there is no additional requirement that the protected class constitute a majority or near-majority of a hypothetical district. A court presented with a dilution claim should undertake a searching evaluation of the totality of circumstances (see, e.g., Elec. Code, § 14028, subd. (e)), including the characteristics of the specific locality, its electoral history, and the design and impact of the at-large system as well as the potential impact of lawful alternative electoral systems. In predicting how many candidates are likely to run and what percentage may be necessary to win, courts may also consider the experiences of other similar jurisdictions that use district elections or some method other than traditional at-large elections.

We express no view on the ultimate question of whether the City's at-large voting system is consistent with the CVRA. The parties vigorously contested in the Court of Appeal whether plaintiffs had established two elements of a CVRA claim: whether voting in city council elections was racially polarized and whether the at-large method of election diluted the voting power of Latino residents in those elections. Because the Court of Appeal concluded that plaintiffs had failed to demonstrate dilution of the Latino vote, it did not consider whether voting in council elections was racially polarized. We have determined that the Court of Appeal relied on an incorrect legal standard to

conclude that plaintiffs had failed to satisfy the dilution element of their CVRA claim. Under the circumstances, we find it appropriate to remand the matter to the Court of Appeal to decide in the first instance whether, under the correct legal standard, plaintiffs have established that at-large elections dilute their ability to elect their preferred candidate; whether plaintiffs have demonstrated the existence of racially polarized voting; and any of the other unresolved issues in the City's appeal. (See *Central Coast Forest Assn. v. Fish & Game Com.* (2017) 2 Cal.5th 594, 606.)

## DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with our opinion.


**EVANS, J.**


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Pico Neighborhood Assn. v. City of Santa Monica

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 51 Cal.App.5th 1002
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S263972
**Date Filed:**  August 24, 2023

---

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Yvette M. Palazuelos

---

**Counsel:**

Lane Dilg, City Attorney, George Cardona, Interim City Attorney; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Marcellus A. McRae, Kahn A. Scolnick, Tiaunia N. Henry and Daniel R. Adler for Defendant and Appellant.

Cole Huber and Derek P. Cole for League of California Cities and California Special Districts Association as Amici Curiae on behalf of Defendant and Appellant.

Strumwasser & Woocher, Bryce A. Gee and Caroline C. Chiappetti for The Santa Monica Transparency Project as Amicus Curiae on behalf of Defendant and Appellant.

John K. Haggerty as Amicus Curiae on behalf of Defendant and Appellant.

The Law Office of Joseph Pertel, Joseph A. Pertel; and Christopher M. Harding for League of Women Voters of Santa Monica, Alliance of

Santa Monica Latino and Black Voters, Human Relations Council Santa Monica Bay Area and Community for Excellent Public Schools as Amici Curiae on behalf of Defendant and Appellant.

Shenkman & Hughes, Kevin I. Shenkman, Mary R. Hughes, Andrea A. Alarcon; Law Office of Robert Rubin, Robert Rubin; Goldstein, Borgen, Dardarian & Ho, Morris J. Baller, Laura L. Ho, Anne P. Bellows, Ginger L. Grimes; Parris Law Firm, R. Rex Parris, Ellery S. Gordon; Law Offices of Milton C. Grimes, Milton C. Grimes; Schonbrun Seplow Harris & Hoffman, Paul Hoffman and John Washington for Plaintiffs and Respondents.

Panish Shea & Boyle and Brian Panish for Richard Polanco, Sergio Farias, Juan Carrillo, Richard Loa and Austin Bishop as Amici Curiae on behalf of Plaintiffs and Respondents.

Hogan Lovells US, Ira M. Feinberg, Erin Chapman, Zach Martinez, Patrick C. Hynds, Derek Centola and Joseph M. Charlet for FairVote as Amicus Curiae on behalf of Plaintiffs and Respondents.

Greenberg Glusker Fields Claman & Machtinger, Douglas E. Mirell and Michelle A. Mabugat for Sara Sadhwani, Bernard Fraga, Janelle Wong, Marisa Abrajano, Jason Casellas, Lorrie Frasure, Matthew Mendez Garcia, Christian Grose, Eric Gonzalez Juenke, Jane Junn, Taeku Lee, Gabriele Magni, Jennifer Merolla, Melissa Michelson, Jessica Lavariega Monforti, Jason Morin, Ricardo Ramírez, Paru Shah, LaFleur Stephens, Dara Strolovitch, Christopher Towler and Tom Wong as Amici Curiae on behalf of Plaintiffs and Respondents.

UCLA Voting Rights Project, Chad W. Dunn and Sonni Waknin for Matt Barreto, Lorrie Frasure, Chelsea Jones, Natalie Masuoka, Gary Segura, Efrén Pérez and Chris Zepeda-Millán as Amici Curiae on behalf of Plaintiffs and Respondents.

Keker, Van Nest & Peters, R. Adam Lauridsen and Connie P. Sung for Asian Americans Advancing Justice–Asian Law Caucus, Asian Americans Advancing Justice–Los Angeles and Asian Law Alliance as Amici Curiae on behalf of Plaintiffs and Respondents.

Rosenfeld Meyer & Susman and Todd W. Bonder for Oscar de la Torre as Amicus Curiae on behalf of Plaintiffs and Respondents.

Lowenstein & Weatherwax, Nathan Lowenstein and Kenneth J. Weatherwax for Bruce A. Wessel as Amicus Curiae.

Rob Bonta, Attorney General, Jonathan L. Wolff, Chief Assistant Attorney General, Heather Hoesterey and Kristin A. Liska, Deputy Attorneys General, for the Attorney General as Amicus Curiae.

Stephen Bosworth and L. Stevan Leonard as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804

Kevin I. Shenkman
Shenkman & Hughes
28905 Wight Road
Malibu, CA 90265
(310) 457-0970